UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

INDIAN JEWELERS SUPPLY CO., INC.,            No. 17-11874 t11

    Debtor.

## OPINION

Three former employees filed claims based on the debtor's defunct employee stock ownership plan ("ESOP"). Debtor objected to the claims, arguing that the claimants were stockholders, not creditors, because the ESOP held debtor's stock in trust for them. As a general matter, the Court agrees with the proposition that employees of a corporation with an ESOP are equity security holders to the extent of their vested ESOP interests. On the other hand, the Court finds and concludes that *former* employees of the corporation, who were or should have been "cashed out" of their ESOP interest years before, are creditors rather than stockholders. As the three claims at issue fall in the latter category, the Court will overrule the objections.

I.     FACTS

The Court finds:[1]

Debtor Indian Jewelers Supply Co., Inc. a New Mexico corporation founded in 1943, was a wholesale and catalog distributor of precious metal, semi-precious gem-stones, tools, equipment, and supplies used to make Indian and southwestern jewelry. Debtor was founded in 1943 and operated until July, 2017.

---

[1] The Court took judicial notice of its docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Pierce Notah, Riley Valentino, and Carolyn Bowen are former employees of the Debtor. Messrs. Notah and Valentino were laid off pre-petition, while Ms. Bowen retired pre-petition.

In 1976 the Debtor established an ESOP. As stated in the plan documents, the ESOP was to:

> (i) provide for [employee's] future financial security by deferring a portion of their compensation and having those funds accumulate under the Plan; (ii) share in the growth and prosperity of the Company; and (iii) accumulate capital for their future economic security; and (iv) acquire beneficial stock ownership interests in the Company.

Pursuant to a related trust agreement, all of Debtor's stock in the ESOP was held in trust for participating employees. There was a vesting schedule. Once an employee was fully vested, she was entitled to receive her allocated shares of Debtor's stock after she retired, quit, or was laid off. The ESOP was governed by the federal Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").

The ESOP documents went through a number of revisions over the years. The Court does not have all the iterations of the plan documents. The record includes the following:

- Indian Jewelers Supply Co. Employees Stock Ownership Plan Benefit Distribution Policy, dated January 1, 2009;
- First Amendment to the Indian Jewelers Supply Co. Employees Stock Ownership Plan, signed December 20, 2011;
- Indian Jewelers Supply Company Employees Stock Ownership Plan Distribution Policy (Effective as of September 1, 2012);
- Summary of Material Modifications to the Summary Plan Description of Indian Jewelers Supply Co. Employees Stock Ownership Plan (effective September 1, 2012);
- Second Amendment to the Indian Jewelers Supply Co. Employees Stock Ownership Plan (dated October 18, 2012);
- Fourth Amendment to the Indian Jewelers Supply Co. Employees Stock Ownership Plan (undated, but apparently intended to become effective September 30, 2013);
- Employee Stock Ownership and 401(k) Plan (As amended and Restated Generally Effective as of April 1, 2014);
- ESOP Component-Distribution Election Information; and
- Summary of Material Modifications to the Summary Plan Description of Indian Jewelers Supply Company Employee Stock Ownership Plan;

The ESOP also allowed for some diversification of an employee's account. Although most of the claimants' accounts held Debtor's stock, they each had relatively small amounts of cash or other investments.

The ESOP's rules about distributing shares to laid-off employees changed in 2014. The rule on January 1, 2009, was:

> 2. <u>Termination of Service for a Reason Other than Retirement, Death or Disability</u>: If a Participant terminates Service because of designation by the Company as a laid-off employee distribution of his Company Stock Account will be offered to him *beginning as soon as practicable following his termination*.[2]

(emphasis added). This rule was re-written as of September 1, 2012:

> <u>Timing of Distributions</u>. Effective as of September 1, 2012, when you terminate employment on or after age 65 or due to Total and Permanent Disability or death, distribution of your Account will begin as soon as practicable in the Plan Year (which ends on March 31) following the Plan Year in which your termination occurs. If, however, you are laid off, distribution of your Account will begin *as soon as practicable following your termination*.[3]

(emphasis added). Debtor changed the rule again as of April 1, 2014:

> <u>Termination of Employment for a Reason Other than Death, Disability or Retirement</u>. In the case of a Participant who terminates employment with all of the Employers for a reason other than retirement on or after attaining his Normal Retirement Age, Total and Permanent Disability or death, the Committee will direct the Trustee to commence distribution of the Participant's vest Account as follows:
> . . . .
>   (ii)  <u>Participant's Vested Account Exceeds $5,000</u>. Subject to subsections 8.5(c) and 8.5(d), if the Participant's vested Account exceeds $5,000 on the date payment is to be made or commence, his vested 401(k) Account will be distributed as soon as administratively practicable following the Participant's termination of employment and his vested ESOP Account will be distributed *no later than the end of the Plan Year following the earlier of: (A) the end of the fifth Plan Year following the Plan Year in which the Participant terminates employment*;

---

[2] Indian Jewelers Supply Co. Employees Stock Ownership Plan Benefit Distribution Policy, dated January 1, 2009.

[3] From the Summary of Material Modifications to the Summary Plan Description of Indian Jewelers Supply Co. Employees Stock Ownership Plan (effective September 1, 2012).

or (B) the end of the Plan Year in which the Participant attains Normal Retirement Age.[4]

(emphasis added).

Debtor's stock was not publicly traded. Because there was no ready market for the stock, the ESOP included a "put" option, which if exercised obligated the Debtor to buy the distributed shares from the former employee at their fair market value. Fair market value was determined by an independent appraiser. If the value of the "put" shares was more than $25,000, the Debtor had the right to pay for the shares over five years in equal annual payments.

The appraised value of the Debtor's stock declined dramatically between 2010 and 2016:[5]

| Valuation Date | Appraised debtor value | Total Shares Outstanding | Value Per Share | Valuation company |
| --- | --- | --- | --- | --- |
| 3/31/2010 | $3,405,000 | 1,034 | $3,292 | Prairie Capital |
| 3/31/2011 | $3,918,000 | 1,034 | $3,788 | Prairie Capital |
| 3/31/2012 | $3,867,000 | 1,034 | $3,739 | Prairie Capital |
| 3/31/2013 | $1,624,000 | 1,034 | $1,570 | Prairie Capital |
| 3/31/2014 | $1,381,000 | 1,034 | $1,335 | Prairie Capital |
| 12/31/2014 | $406,000 | 1,034 | $392 | Prairie Capital |
| 12/31/2015 | $472,000 | 1,034 | $456 | Valuation Advis. Services |
| 12/31/2016 | $23,000 | 759 | $30 | Valuation Advis. Services |

Carolyn Bowen was employed from 1993 until 2013. She participated and was fully vested in the ESOP. When Ms. Bowen retired in December 2013 at age 74, she asked for distributions of all Debtor shares and diversified investments. Ms. Bowen received some cash for her diversified accounts. In May 2015 the ESOP distributed her Debtor shares to her. Ms. Bowen exercised her

---

[4] Employee Stock Ownership and 401(k) Plan (As amended and Restated Generally Effective as of April 1, 2014)

[5] According to a February 7, 2014, letter from the ESOP's counsel to Ms. Bowen's counsel, Debtor retained a new stock appraisal firm to value the shares held by the ESOP. The new firm, Prairie Capital, reappraised the stock value for the years ended March 31, 2010, 2011, and 2012.

right to "put" the shares to the Debtor and receive cash. The Debtor gave her a promissory note dated May 19, 2015 for $25,923.11, payable in five equal annual payment of $5,184.62, with the first payment due May 19, 2015.[6] Because of the tax laws governing ESOP distributions, Ms. Bowen had to pay income tax on the entire $25,923.11 in 2015.

On October 24, 2017, Ms. Bowen filed a claim for $21,554.87. Her claim is based entirely on the unpaid balance of the promissory note she received in May 2015.

Pierce Notah worked for Debtor from 1981 until 2012. According to a letter Mr. Notah filed with the Court on July 27, 2018:

> I worked 36 years for this company and put my best effort to travel 80 miles a day to work. The last year I got an eye injury during working there.

Mr. Notah was laid off in October 2012. He was 59 at the time. The last statement sent to Mr. Notah from the ESOP, for the period 4/1/2011 through 3/31/2013, showed:

|  | Beginning balance | Contributions | Earnings | Shares released due to contribution | Shares reallocated | Ending balance |
|---|---|---|---|---|---|---|
| Money market account | $1,881.81 | $2,475.59 | ($48.40) |  | ($238.54) | $4,070.47 |
| Company stock account | 37.656 |  |  | 1.072 | 0.052 | 38.780 |
| Total value of company stock (price per share: $3,739.01) | | | | $144,999.23 | | |
| Total Money Market Account | | | | $4,070.47 | | |
| Total Account Balance as of March 31, 2012 | | | | $149,069.69 | | |
| Total Vested Account Balance as of March 31, 2012 | | | | $149,069.69 | | |
| Vesting Percentage | | | | $100.00% | | |

---

[6] The stock value was substantially less than Ms. Bowen had been led to believe she would receive on retirement. While her account statement for the plan year ending March 2012 showed a balance of $99,854.24, revised figures for March 31, 2013 reflected a balance of $45,320.16. The reduction was entirely the result of the decrease in the value of the Debtor's stock.

The ESOP did not comply with the plan requirement to distribute Mr. Notah's Debtor shares "as soon as practicable" after he was laid off. In fact, no stock distributions were made to Mr. Notah in the nearly five years that elapsed between his termination and Debtor's bankruptcy filing.

Mr. Notah attempted from time to time to receive payment on his ESOP account. He stated in his July 27, 2018, filing:

> I and other employees were told this ESOP plan was to be distributed to us when we leave the company after one year to the anniversary of the following year. Since I was let go on October 12, 2012, I should've already been paid on October 12, 2013 on my ESOP plan. David Vining was CEO at the time and Chris Caldes was the General Manger [sic], and trustee of this plan, also Joe Ward was too, at time I was let go. Linda Zachary was a new Trustee to the plan, after contacting her about being paid on my ESOP, she told me I will be paid out on later date, which never happened to this date. She also gave me a hard time with it, not answering question, or accepting phone calls, and refusing to meet me.

On October 2, 2017, Mr. Notah filed a claim for $149,069.69. The stated basis of the claim is "retirement claim." Attached are annual ESOP statements from 3/31/2008 through 3/31/2012.

Riley Valentino, a former employee, was laid off on May 29, 2014. He never received a distribution of his vested Debtor shares. Mr. Valentino filed a proof of claim for $23,133.92 on October 5, 2017.

In the years leading up to the bankruptcy filing, the Debtor began delaying the purchase of shares "put" to it by retiring or laid off employees. On December 20, 2011, the Debtor suspended making distributions entirely until it could re-value its stock. Distributions were resumed on September 1, 2012. On February 7, 2014, the Debtor notified Ms. Bowen that it would buy her "put" shares over time rather than in a lump sum.[7] In a January 8, 2015, letter to ESOP participants,

---

[7] Ms. Bowen had asked for ESOP distributions several years before she retired. Although the plan documents allow for such "in service" distributions, the plan administrator did not tell Ms. Bowen about that option, so she never followed up on it.

the Debtor said that it "is currently exploring options for funding distributions and diversifications to eligible participants." In a February 27, 2015 letter to participants, the Debtor notified them that stock payouts would be by promissory note. The Debtor began issuing promissory notes to buy stock rather than pay cash.[8] In March 2017, Debtor defaulted on its promissory note obligations to former employees.[9]

Debtor filed this case on July 21, 2017, immediately after terminating its employees ceasing all business operations.

On July 11, 2018, Debtor objected to all ESOP-related claims (the "Equity Security Objection"), including the Bowen, Notah, and Valentino claims, arguing that the claimants hold equity securities, not debt. Bowen, Notah, and Malentino responded to the claim objection. On the same date, Debtor objected to the claims of Ms. Bowen and two other former employees who were given promissory notes by the Debtor (the "Noteholder Objection"). In the Noteholder Objection the Debtor asks the Court to "correctly classify" Ms. Bowen's interest as an equity security interest rather than a debt claim.

Mr. Valentino did not attend the preliminary hearing on the claim objection and the Court entered a default order disallowing his claim (the "Default Order"). Mr. Valentino filed a motion to set aside the Default Order, saying he was ill on the preliminary hearing date and could not attend. Mr. Valentino appeared at the final hearing on the claim objection. The Court took under advisement his request to set aside the Default Order and allowed Mr. Valentino to participate in the final hearing.

---

[8] May 19, 2015 letter to Ms. Bowen.
[9] March 27, 2017 letter to note holders.

-7-
Case 17-11874-t11    Doc 220    Filed 06/06/19    Entered 06/06/19 15:06:52 Page 7 of 13

## II.     DISCUSSION

A.     <u>Debtor's Claim Objection</u>.

The claim objection states:

> 2. Although most of the claims were inaccurate, the Debtor is not challenging the amount of the claim at this time only the categorization and general unsecured claims. There will not be enough funds to pay all general unsecured claims in full so the ESOP claimants, unfortunately, are expected to receive no dividend for their ESOP interest.
> 3. The ESOP participants are equity security holders under the Bankruptcy Code, Code section 101(16), and under both under the Bankruptcy Code and New Mexico Law, cannot receive payment if creditors will not be paid.
> . . . .
> WHEREFORE, [the claims] should be Disallowed as unsecured claims and treated as equity for the purposes of the Chapter 11 Plan.

Thus, Debtor is not asking the Court to equitably subordinate the claims, *see, e.g., In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977) (oft-cited case on equitable subordination), nor to recharacterize the debt claims as equity, *see generally In re S.M. Acquisition Co.*, 2006 WL 2290990, at *8 (N.D. Ill.) (discussing the elements needed to recharacterize debt as equity), but simply to rule that the claimants hold equity securities. Debtor cites 11 U.S.C. § 101(16) and (17), which provide:

> (16) The term "equity security" means--
>    (A) share in a corporation, whether or not transferable or denominated "stock", or similar security;
>    (B) interest of a limited partner in a limited partnership; or
>    (C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.
> (17) The term "equity security holder" means holder of an equity security of the debtor.

B.     <u>Treatment of ESOP Claims in Bankruptcy</u>.

Employees of a debtor who files bankruptcy may be equity security holders to the extent they participate in the debtor's ESOP. *See, e.g., In re Mansfield Ferrous Castings, Inc.*, 96 B.R.

779, 781 (Bankr. N.D. Ohio 1988) (as participants in and beneficiaries of the ESOP Trust which holds the debtor's stock, employees are equity security holders); *In re Merrimac Paper Co.*, 420 F.3d 53, 64 (1st Cir. 2005) (during period of employment, an ESOP participant is functionally a stockholder); *see generally Matter of Envirodyne Indus., Inc.*, 79 F.3d 579 (7th Cir.1996) (stock redemption claims are in essence equity security claims).

The claims of terminated or retired employees are different. The leading case on this point is *Merrimac Paper*. In *Merrimac Paper* the debtor brought an adversary proceeding to equitably subordinate the claim of a retired employee. The former employee's claim was based on a stock redemption note he received from the debtor when he "put" his ESOP shares to the debtor for purchase. The bankruptcy court and the district court ruled that his note claim should be equitably subordinated. The First Circuit reversed, holding:

> [T]he stock redemption transaction in this case occurred within the ERISA framework. That matters because a participant in an ERISA plan does not assume the same levels of risk as a typical equity investor. Indeed, one of ERISA's principal purposes is to minimize risks to a participant's retirement benefits. *See* 29 U.S.C. § 1001(b); *see also Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 375, 100 S. Ct. 1723, 64 L.Ed.2d 354 (1980) (stating that ERISA seeks to ensure that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he will actually receive it"). Thus, although the employee's position entails market risk during the period of employment (the ESOP holds the stock in trust for its participants, and so the employee is, functionally, a stockholder), ERISA seeks to eliminate that risk once retirement occurs. The ordinary repurchase by a company of its stock carries with it the implied condition that payment is contingent on the fulfillment of obligations to other creditors. *Cf Robinson v. Wangemann,* 75 F.2d 756, 757–58 (5th Cir.1935) (implying the existence of such a condition). The mandates of ERISA, however—particularly its requirement that the holders of ESOP-spawned stock redemption notes be given adequate security—argue persuasively against the implication of any such condition where an ERISA-qualified ESOP is involved.

420 F.3d at 64. The Court finds *Merrimac Paper's* analysis persuasive. Employees are not typical investors. Retired and terminated employees, in particular, view their ESOP accounts as retirement

accounts whose value is fixed on the date of termination, especially when their former employer is obligated to buy the ESOP shares at fair market value.

C.     Whether the Objections Should be Sustained as to Bowen, Notah, and Valentino.

1.     Ms. Bowen. In Ms. Bowen's case, Debtor's objection must be overruled. Ms. Bowen does not hold an equity security; she holds a promissory note. While it would be possible for the Debtor to file an adversary proceeding to recharacterize or equitably subordinate Ms. Bowen's note, it has not done so.[10] Whether such a proceeding would be successful is questionable, given the *Merrimac Paper* analysis.[11] The relief Debtor has sought, i.e., disallowance of the claim because Ms. Bowen holds an equity security, cannot be granted. Ms. Bowen holds a debt instrument.

2.     Mr. Notah. Mr. Notah's situation is different, but the Court concludes that the result should be the same. There is no question that Mr. Notah would have "put" his shares to the Debtor had he been given the chance to do so. Through no fault of his own, the Debtor refused to distribute Mr. Notah's vested shares to him, even though the Debtor was obligated to do so "as soon as practicable." It would be unfair to treat Mr. Notah's situation differently than Ms. Bowen's simply

---

[10] The Court does not view the either objection as asserting a cause of action for equitable subordination or recharacterization. The Noteholder Objection comes closer to seeking recharacterization, perhaps, but falls short. Such equitable causes of action must be brought by adversary proceeding, *See* Fed. R. Bankr. P. 7001 (7) and (8), and should allege the elements of a recharacterization claim. In the Noteholder Objection the Debtor again cites 11 U.S.C. § 101(16), so it is difficult to say that it is fundamentally different than the Equity Security Objection. The Court's ruling is without prejudice to the Debtor's right to bring an equitable subordination/recharacterization adversary proceeding.

[11] Like in *Merrimac*, "by structuring the transaction to play out over time, the debtor placed the appellant in his present predicament as a noteholder." 420 F.3d at 64. The Court, like the court in *Merrimac*, concludes that under such circumstances "there is a strong policy argument that the Note should be viewed for what it is: a note received in partial payment of retirement plan benefits." *Id.* at 64-65.

because the Debtor complied with the ESOP distribution rules in her case but not in his.[12] The Court finds and concludes that Mr. Notah's claim against the Debtor is a debt claim, not an equity claim.

3.   <u>Mr. Valentino</u>. The Court rules that Mr. Valentino's motion to set aside the Default Order is well taken and should be granted, based on Mr. Valentino's excusable neglect. *See* Bankruptcy Rules 9014 and 7054 and Fed. Rules of Civ. Pro. 54 and 60(b)(1). The Court finds credible Mr. Valentino's testimony that he was ill on the day of the preliminary hearing and could not attend. The Court makes some allowance for the fact that Mr. Valentino is pro se, is not sophisticated in legal matters, responded to the claim objection timely, promptly filed the motion to set aside the Default Order, and attended the final hearing on the claim objection.

The Court finds that, on the merits, the Debtor's objection to Mr. Valentino's claim should be overruled. Mr. Valentino was laid off more than three years before Debtor filed this case. Debtor changed the ESOP language about distributions to laid off employees less than two months before firing Mr. Valentino. The language went from "as soon as practicable but not later than" to "not later than . . . ." The Court questions whether the Debtor can unilaterally reduce an employee's vested retirement rights *ex post facto* and without consent. Under New Mexico law (see § 10.4 of the Plan), there is an implied covenant of good faith and fair dealing. *See, e.g., Bogle v. Summit Investment Co., LLC*, 137 N.M. 80, 87-88 (Ct. App. 2005). The Court finds and concludes that it would violate the implied covenant of good faith and fair dealing to take a long-term employee's

---

[12] One difference between the two is that Ms. Bowen retained able counsel to represent her in her demand for a payout, while Mr. Notah did not. It does not reflect well on the Debtor that it responded promptly to Ms. Bowen's demands but brushed Mr. Notah aside for nearly five years, and then objected to his claim.

vested ESOP right to be paid "as soon as practicable" and change it to "five years after being laid off" right before firing him.

Third, the Court finds that the plan language is ambiguous. "No later than" could mean "probably not until," or it could mean "within a reasonable time but no later than." The Court will construe the ambiguity against the drafter. *See, e.g., Heye v. American Golf Corp., Inc.*, 134 N.M. 558, 563 (Ct. App. 2003) Long before Debtor filed this case, it should have purchased Mr. Valentino's distributed ESOP shares and paid him cash and/or a note.

Finally, even if was not a breach of contract for the ESOP to refuse to distribute Mr. Valentino's shares, upon termination Mr. Valentino's interest in the ESOP changed from a plan participant to a frustrated creditor, trying to collect his retirement benefits from the Debtor. Given all of the circumstances of this case, it would not be fair to treat Mr. Valentino as an equity security holder.

### III. CONCLUSION

Former employees with claims that arise under a debtor's ESOP should not necessarily be viewed as equity security holders. In Ms. Bowen's case, it is clear she holds a note, not stock. Equitably subordinating or recharacterizing the note would be an uphill battle, given *Merrimac Paper*, but Debtor has not sought those remedies. Mr. Notah's and Mr. Valentino's claims should have been the same as Ms. Bowen's, but for the ESOP's inexcusable refusal to distribute their vested shares after Debtor laid them off. Separate orders will be entered overruling Debtor's claim objections and granting Mr. Valentino's motion to set aside the Default Order.

                /s/ David T. Thuma
                _____
                Hon. David T. Thuma
                United States Bankruptcy Court

Entered: June 6, 2019

Copies to: electronic notice recipients

Carolyn Bowen
3556 Placita Del Suenos
Rio Rancho, NM 87124

Pierce Notah
900 Spain RD NE, # M1070
Albuquerque, NM 87111

Riley Valentino
P.O. Box 2231
Gallup, NM 87301